IN THE UNITED STATES COURT
OF INTERNATIONAL TRADE

| | |
|---|---|
| B. UNITED INTERNATIONAL INC.<br>　　　　　　Plaintiff,<br><br>v.<br><br>U.S. CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; and the UNITED STATES OF AMERICA<br><br>　　　　　　Defendants. | Case No.  1:26-cv-00906 |

# COMPLAINT

## PARTIES

1.Plaintiff B. United International Inc. ("B. United" or "Plaintiff") is a Connecticut-based business specializing in the importation and distribution of small-batch beers, ciders, sakes, and meads subject to the challenged duties. The products that Plaintiff imports are specialty items without domestic analogues.

2.At all relevant times, Plaintiff was and is a United States private company, incorporated in the State of Connecticut with a principal place of business at 7 Fox Hollow Rd, Oxford, Connecticut, 06478.

3.Defendant United States Customs and Border Protection ("CBP") is an agency of the United States Department of Homeland Security maintaining

1

headquarters at 300 7th St SW, Washington, DC 20024. CBP, a component of the Department of Homeland Security, administers the customs laws at the border and collects duties, tariffs, and import taxes on merchandise entering the United States.

4. Defendant Rodney S. Scott ("Mr. Scott") is an individual who, at all relevant times, was and is acting as the Commissioner of CBP and is sued in his official capacity in this position.

5. Defendant United States of America ("United States" or "USA"), having received the duties challenged in this action, is named as the statutory defendant under 5 U.S.C. § 702 and 28 U.S.C. § 1581(i)(1)(B).

6. Defendants CBP, Mr. Scott, and the United States are referred to collectively in this complaint as "Defendants".

## PRELIMINARY STATEMENT

7. In or about February 2025, the President issued multiple executive orders asserting authority under the International Emergency Economic Powers Act ("IEEPA") to impose sweeping new tariffs (the "IEEPA Duties") on goods imported into the United States from nearly every foreign country, including Plaintiff's source countries. As a result, Plaintiff is required to pay the IEEPA Duties on its imported goods.

8. However, the Federal Circuit has found that the IEEPA does not authorize the IEEPA Duties. *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir.), *cert. granted*, No. 25-250, 2025 WL 2601020 (U.S. Sept. 9, 2025) (holding that

"the particular tariffs at issue are not among the tools IEEPA makes available through the authorization to 'regulate . . . importation' of goods, IEEPA § 203(a)(1)(B) [50 U.S.C. § 1702(a)(1)(B)], even when all the required preconditions are met.").

9. On November 5, 2025, the U.S. Supreme Court heard oral argument in *V.O.S. Selections* and a companion case arising out of the U.S. District Court for the District of Columbia. A ruling is anticipated to be handed down shortly. See, *Learning Res., Inc. v. Trump*, 784 F. Supp. 3d 209 (D.D.C. 2025), cert. granted before judgment, No. 24-1287, 2025 WL 2601021 (U.S. Sept. 9, 2025).

10. In this case, Plaintiff seeks an order from this Court that aligns with the Federal Circuit's previous ruling in *V.O.S. Selections*, and that finds that both the Defendants' imposed IEEPA duties and the challenged executive orders are unlawful.

11. While *V.O.S. Selections* will likely be decided in the very near future, this instant action is necessary to protect the individual interests of Plaintiff. Even if the SCOTUS ultimately holds the tariff orders unlawful, that ruling alone does not automatically resolve Plaintiff's entitlement to refunds on its own entries. Plaintiff seeks case-specific relief to preserve its ability to obtain repayment of duties it has already remitted.

12. Further, time is of the essence in the instant action. The next set of imported entries for which Plaintiff has already paid tariffs imposed under authority of IEEPA will become liquidated and finalized as early as January 2026. In fact, as of this filing, many such prior entries have already been liquidated. Given this, Plaintiff seeks relief from the impending liquidations to ensure that its right to a

3

complete refund is not jeopardized. Plaintiff intends to imminently file an application for preliminary injunction to suspend liquidation before additional entries are liquidated.

13. Accordingly, Plaintiff seeks: (i) a declaration that the IEEPA Duties are unlawful; (ii) an injunction preventing Defendants from imposing further duties on Plaintiff under the executive orders challenged in this lawsuit; (iii) an order suspending liquidation of all unliquidated entries subject to the IEEPA Duties and (iv) full refund from Defendants of all IEEPA Duties that Plaintiff has already paid to the United States as a result of the executive orders challenged in this lawsuit, as well as those that Plaintiff will continue to pay.

## JURISDICTION

14. This Court has subject-matter jurisdiction over this action because it "is commenced against an officer of the United States and arises out of an executive order providing for tariffs". 28 U.S.C. § 1581(i)(1)(B). *See V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312, 1334, citing *Silfab Solar, Inc. v. United States*, 296 F. Supp. 3d 1296 (Ct Int'l Trade 2018).

15. Under 28 U.S.C. § 1581, in a civil action, the Court of International Trade (CIT) can "enter a money judgment for or against the United States" and can "order any other form of relief that is appropriate in a civil action, including, but not limited to, declaratory judgments, orders of remand, injunctions, and writs of mandamus and prohibition". 28 U.S.C. §§ 2643(a)(1), (c)(1).

16. Plaintiff has standing because it is the importer of record for entries subject to the challenged IEEPA duties, and it has been required to remit those

4

duties to the United States. Those payments are a concrete financial injury traceable to the challenged executive orders and redressable by declaratory and injunctive relief. Plaintiff also faces imminent harm because liquidation of additional duty-paid entries is fast-approaching, and some entries have already liquidated.

## FACTS and LEGAL AUTHORITIES

### I. President Trump's Executive Orders and the Implementation of the IEEPA Duties

17. On February 1, 2025, President Donald J. Trump (the "President" or "President Trump") issued three executive orders imposing tariffs on imports from Canada, Mexico and China. Each of these executive orders relied on IEEPA as purported authority for the tariffs. President Trump claimed that each executive order and corresponding tariff initiative was justified under IEEPA due to an alleged national emergency. These tariffs are collectively referred to herein as the "Tariff Orders."

18. Executive Order 14194, 90 Fed. Reg. 9,117, entitled *Imposing Duties To Address the Situation at Our Southern Border* ("Mexico Tariff Executive Order"), which imposed an additional 25% tariff on goods imported from Mexico, relied on the President's claim of emergency powers rooted in "the grave threat to the United States posed by the influx of illegal aliens and illicit drugs into the United States" and "the failure of Mexico to arrest, seize, detain, or otherwise intercept [drug trafficking organizations], other drug and human traffickers, criminals at large, and illicit drugs."[1]

---

[1] Exec. Order No. 14194, *Imposing Duties To Address the Situation at Our Southern Border*, 90 Fed. Reg. 9,117 (Feb. 7, 2025).

19. Similarly, Executive Order 14193, 90 Fed. Reg. 9,113, entitled *Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border* ("Canada Tariff Executive Order"),[2] also imposed an additional 25% tariff on goods imported from Canada and claimed its authority was derived from a declared emergency of opioid trafficking.

20. Lastly, Executive Order 14195, 90 Fed. Reg. 9121, entitled *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China* ("China Tariff Executive Order"), imposed an additional 10% *ad valorem* tariff and similarly declared a national emergency due to "the sustained influx of synthetic opioids" opioid trafficking, and stated that "[m]any PRC-based chemical companies also go to great lengths to evade law enforcement and hide illicit substances in the flow of legitimate commerce."[3] Given this, the President's claim of emergency powers was therefore reliant on "the failure of the [People's Republic of China] government to arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, … criminals at large, and drugs." *Id.*

21. On or about February 5, 2025, the President issued yet another order directed at Chinese imports, Executive Order 14200, which was entitled *Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China.* ("February 5 Amendment").[4]

22. Further, on or about March 3, 2025, the President again amended the

---

[2] Exec. Order No. 14193, *Imposing Duties To Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 9,113 (Feb. 7, 2025).
[3] Exec. Order No. 14195, *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,121 (Feb. 7, 2025).
[4] Exec. Order No. 14200, *Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9277 (Feb. 11, 2025).

China Tariff Executive Order through an additional Executive Order 14228, 90 Fed. Reg. 11,463, entitled *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China.*[5] This Amendment increased the incremental tariffs on imports from China to 20% and attempted to legitimize this increase with claims that "the PRC has not taken adequate steps to alleviate the illicit drug crisis."

23.     On April 2, 2025, the President declared that longstanding trade imbalances between the United States and its trading partners constituted a national emergency and, on that basis, issued Executive Order 14257, entitled *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits.* This reciprocal tariff order instated a 10% baseline tariff on nearly all imports to the United States and went into effect on April 5, 2025. The Order further authorized and implemented heightened "reciprocal" tariff rates on imports from 57 designated countries, which took effect on April 9, 2025. *Id.*

24.     On April 8, 2025, President Trump raised the reciprocal tariff rate on China by 50% (increasing the rate from 34% to 84%) in response to new retaliatory tariffs issued by China. Exec. Order No. 14, 259, 90 Fed. Reg. 15,509, entitled *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports from the People's Republic of China.*[6]

---

[5] Exec. Order No. 14228, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11,463 (Mar. 7, 2025).

[6] Exec. Order No. 14259, *Amendment to Reciprocal Tariffs and Updated Duties As Applied to Low-Value Imports from the People's Republic of China*, 90 Fed. Reg. 15509 (Apr. 14, 2025).

7

25. On April 9, 2025, President Trump suspended the additional reciprocal tariffs on all countries for 90 days. The single exception to this suspension was China-specific tariffs, for which the President raised the reciprocal tariff rate yet again, increasing from 84% to 125%. Exec. Order No. 14,266, 90 Fed. Reg. 15,625 (Apr. 9, 2025), entitled *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment*.[7] All the while, the 20% trafficking tariff on imports from China remained intact, meaning that most imports from China faced a minimum 145% IEEPA tariff.

26. Defendants implemented the orders through HTSUS modifications that created new tariff provisions, requiring importers to classify covered merchandise under those new provisions at the additional duty rates.

27. On April 14, 2025, several companies jointly filed an action in this Court that challenged the legality of these tariff orders. *See V.O.S. Selections, et al. v. Donald J. Trump, et al.*, No. 25-cv-00066 (Dkt. 2). Later, this Court held these challenged orders were unlawful and the Federal Circuit, sitting *en banc*, affirmed.

28. In the months following the filing of the *V.O.S. Selections* complaint, the President, again relying on IEEPA for legitimacy, has issued even further executive orders, which both introduced new additional tariffs and modified other existing tariffs. However, in order to streamline relief in the instant case, this action only seeks to challenge the orders that the Federal Circuit has already held to be

---

[7] Exec. Order No. 14266, *Modifying Reciprocal Tariff Rates To Reflect Trading-Partner Retaliation and Alignment* (Apr. 9, 2025) 90 Fed. Reg. 15625 (Apr. 15, 2025).

unlawful ("Challenged Tariff Orders").

## II. Liquidation Process

29. CBP assesses and collects customs duties pursuant to the Harmonized Tariff Schedule of the United States ("HTSUS"), which sets forth the applicable duty rates and classifications for imported merchandise. See 19 U.S.C. §§ 1202, 1500, 1502.

30. CBP classifies goods imported into the United States consistent with the HTSUS, which is organized according to a series of headings and subheadings. 19 U.S.C. § 1202. The HTSUS is structured such that its larger headings describe broad categories of goods, while its subheadings provide a particularized categorization of the goods within each of its stated categories. *Id.*

31. CBP's regulations govern the classification and appraisement of merchandise, consistent with the HTSUS. 19 C.F.R. § 152.11. ("Merchandise shall be classified in accordance with the Harmonized Tariff Schedule of the United States (19 U.S.C. § 1202) as interpreted by administrative and judicial rulings.").

32. The United States International Trade Commission ("USITC") both publishes and ensures that the HTSUS is consistent with presidential orders. 19 U.S.C. §§ 1202, 3005, 3006; *see also Michael Simon Design, Inc. v. United States*, 33 C.I.T. 1003, 1010 (2009) ("The authority to modify the HTSUS lies with the President"); *Maple Leaf Marketing, Inc. v. United States*, 582 F. Supp. 3d 1365, 1378–79 (Ct. Int'l Trade 2021).

33. Liquidation is CBP's final computation of duties on an entry. 19 C.F.R. § 159.1; 19 U.S.C. § 1504.

34. Importers deposit estimated duties at entry based on value, origin, and classification, after which CBP determines the final amount owed pursuant to its appraisement and classification authority. *See* 19 U.S.C. §§ 1484, 1500; 19 U.S.C. § 1202.

35. Once CBP liquidates an entry, the avenues for contesting the duty assessment are limited and time-constrained, and in certain circumstances, judicial intervention is unavailable where CBP's role is purely ministerial. *See* 19 U.S.C. § 1514; *Rimco Inc. v. United States*, 98 F.4th 1046, 1053 (Fed. Cir. 2024).

36. Although liquidation ordinarily must occur within one year absent extension, and CBP may extend liquidation upon a showing of good cause, the Court retains equitable authority to suspend liquidation to preserve meaningful judicial review and prevent irreparable harm. *See* 19 U.S.C. § 1504(a), 19 U.S.C. § 1504(b)(2); 19 C.F.R. § 159.12(a)(1)(ii); *see also In re Section 301 Cases*, 524 F. Supp. 3d 1355, 1365–66 (Ct. Int'l Trade 2021).

37. The Federal Circuit has likewise recognized that suspension of liquidation may be necessary to avoid undermining injunctive relief and to prevent entries from being liquidated while a court order is being implemented. *Target Corp. v. United States*, 134 F.4th 1307, 1316 (Fed. Cir. 2025).

38. Precedent in both this Court and the Federal Circuit makes clear that, once liquidation occurs, the legal mechanisms for recouping unlawfully imposed duties are sharply constrained, if not eliminated altogether. *See In re Section 301 Cases*, 524 F. Supp. 3d at 1365-66 ("It may be that on appeal the Court of Appeals will make clear that 28 U.S.C. §§ 1585 and 2643 empower the CIT to 'enter a money judgment . . . against the United States in any civil action commenced under section

10

1581' for the return of unlawfully collected duties, 28 U.S.C. § 2643(a)(1), or 'may . . . order any other form of relief' including reliquidation, id. § 2643(c)(1), but, until it does, we must conclude that liquidation will result in irreparable economic harm"); *Target Corp. v. United States*, 134 F.4th 1307, 1316 (Fed. Cir. 2025) (holding that, "The CIT ordered the injunction, which 'was to become effective five days after service on particular Commerce and Customs officials.'" And that the "purpose of the delay was to avoid 'an inadvertent violation' of the injunction by 'ensuring that the appropriate Government officials receive notice' and by 'providing the Government with the time needed to keep the entries from being . . . liquidated.'").

39. The Challenged Tariff Orders cite to a combination of IEEPA, 50 U.S.C. § 1701 *et seq.*, the National Emergencies Act, 50 U.S.C. § 1601 *et seq.*, section 604 of the Trade Act of 1974, as amended, 19 U.S.C. § 2483, and 3 U.S.C. § 301 in claiming their authority to impose their respective tariffs.

40. However, it must be noted that none of these cited statutes explicitly authorize the President to impose tariffs. In asserting the authority to implement these tariffs, President Trump and CBP rely entirely upon IEEPA, rather than the aforementioned constellation of statutes, for their power to both implement and collect the challenged IEEPA duties. In essence, IEEPA is an insufficient source of legitimacy for President Trump's power to impose these duties.

### A. The U.S. Constitutional power to impose tariffs rests with Congress rather than with the Executive.

41. IEEPA does in fact empower the President to enact certain tariffs, but this power is limited to circumstances that "deal with an unusual and extraordinary

11

threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose." 50 U.S.C. § 1701(b).

42. The President also has the authority to control, block, or prohibit the movement or importation of funds or property in which "any foreign country" or foreign national has "interest" in, and which is also subject to the U.S. jurisdiction. 50 U.S.C. § 1702(a)(1)(B).

43. Further, the President may only confiscate property of a foreign person or country that is subject to U.S. jurisdiction when the United States is engaged in "armed hostilities" or has been attacked by a foreign country. 50 U.S.C. § 1702(a)(1)(C).

44. The IEEPA was first enacted in 1977 and has been amended several times since. However, it has never previously been used by any other president to impose or authorize tariffs, nor was it understood to grant the executive power to do so.

45. The United States Constitution provides that "[a]ll legislative powers herein granted shall be vested in a Congress of the United States." U.S. CONST. art. I, § 1.

46. The United States Constitution also states that "Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises…" U.S. CONST. art. I, § 8, cl. 3 ("Taxing Clause"), and to "regulate Commerce with foreign Nations." *Id.*, cl. 3 ("Commerce Clause"). It is generally understood that the power to enact tariffs is derived from the Taxing and Commerce Clauses of the Constitution, which grants these powers to Congress.

47. Congress may delegate limited authority to the Executive only where it supplies standards capable of guiding and constraining that authority. *See Fed. Commc'ns Comm'n v. Consumers' Rsch.*, 145 S. Ct. 2482, 222 L. Ed. 2d 800 (2025). IEEPA provides no such standards with respect to tariffs, reinforcing that Congress did not intend to transfer tariff-setting power to the President

48. Interpreting IEEPA as authorizing tariffs would be self-defeating because it would in turn require striking down IEEPA as unconstitutional under the nondelegation doctrine for lack of any intelligible principle.

49. Moreover, "[c]ourts expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 716 (2022) (cleaned up) (*quoting Utility Air Regulatory Group v. EPA*, 573 U. S. 302, 324 (2014)). When Congress has not clearly spoken, courts are directed to find that matters "of vast economic and political significance" are beyond the power of the President. *Biden v. Nebraska*, 600 U.S. 477, 505–06 (2023).

50. Given the above, the Challenged Tariff Orders are "of vast economic and political significance," owing to the fact that the IEEPA does not explicitly authorize the President to set tariffs. Further, especially given the fact that IEEPA does not contain the words "tariff" or "duty", it stands to reason that Defendants are therefore not authorized to implement and collect duties under the Challenged Tariff Orders.

    **B.**     **Several courts, including this Court, have agreed that the IEEPA duties are not authorized.**

51. In *V.O.S. Selections, Inc. v. Trump*, this Court held that the President exceeded his statutory authority under IEEPA by imposing tariffs through executive order and permanently enjoined enforcement of the challenged duties. 772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025).

52. The Federal Circuit, sitting en banc, affirmed that judgment, concluding that IEEPA does not clearly authorize tariff-setting authority and that reading the statute to permit such action would raise serious constitutional concerns. 149 F.4th 1312 (Fed. Cir. 2025).

53. Separately, the United States District Court for the District of Columbia reached the same conclusion in *Learning Resources, Inc. v. Trump*, holding that IEEPA does not authorize tariffs of any kind. 784 F. Supp. 3d 209 (D.D.C. 2025).

54. The Supreme Court subsequently granted certiorari in both cases and consolidated them for review. Oral argument was heard on November 5, 2025.

55. Notwithstanding that pending Supreme Court review, Plaintiff brings this action to protect its own interests. Absent Plaintiff-specific relief, duties already paid remain subject to liquidation and are not recoverable, resulting in irreparable harm to Plaintiff.

### III.  Plaintiff paid preliminary IEEPA duties

56. As of the date of this complaint, Plaintiff has already paid $518,539.31 in IEEPA Duties imposed by the Challenged Tariff Orders.

57. Plaintiff's imported items subject to IEEPA entered the United States under new HTSUS codes from foreign countries subject to IEEPA.

58. Plaintiff has continued to pay IEEPA duties since their enactment.

59. The entries for which Plaintiff has paid IEEPA Duties imposed by the Challenged Tariff Orders are, as a general matter, scheduled to begin to liquidate imminently, and Plaintiff has already paid IEEPA duties on its imports since the enactment of said tariffs.

### COUNT I
**The challenged tariff orders exceed the agency's statutory authority and are therefore ultra vires under V.O.S. Selections**

60. Plaintiff repeats and realleges each and every preceding allegation of this complaint as though fully set forth at length herein.

61. The Court of International Trade in *V.O.S. Selections, Inc. v. Donald J. Trump*, 772 F. Supp. 3d. 1350, 1383 (Ct. Int'l Trade 2025), *aff'd*, 149 F.4th 1312 (Fed. Cir. 2025) held that the President surpassed his allotted authority under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 et seq., by imposing additional tariffs on imported goods.

62. IEEPA's emergency-related authority is limited to the regulation of specified categories of foreign transactions. The statute does not confer tariff-setting authority or authorize the imposition of import duties. Neither the text of IEEPA, nor its legislative history reflects any clear congressional delegation empowering the President to establish tariff rates. *See V.O.S. Selections*.

63. On appeal, the Federal Circuit affirmed that IEEPA does not empower the President to impose tariffs and held that the challenged trafficking and reciprocal tariffs exceed the authority conferred to the executive by IEEPA. The court cautioned that any contrary reading would raise substantial constitutional

15

issues under both the major questions and non-delegation doctrines. *See V.O.S. Selections, Inc. v Trump*, 149 F.4th 1312 (Fed. Cir. 2025).

64. The tariff orders challenged here replicate the same statutory structure, underlying authority, and operational intent that this Court and the Federal Circuit rejected in *V.O.S. Selections*. They implement ad valorem duties through HTSUS modifications and cite the authority to do so on an expansive reading of IEEPA alone. For the same reasons set forth in *V.O.S. Selections* and its affirmance by the Federal Circuit, those Tariff Orders exceed the President's statutory authority and are, therefore, unlawful from inception and unenforceable as to Plaintiff.

65. Plaintiff respectfully requests that this Court refer to its own precedent and the binding decision of the Federal Circuit in declaring the Challenged Tariff Orders unlawful as applied to Plaintiff, that it enjoins Defendants from enforcing these tariffs as to Plaintiff, and that it directs Defendants to issue a refund of all IEEPA duties collected from Plaintiff, with interest.

## COUNT II
### The challenged orders constitute an impermissible delegation of legislative authority in violation of the separation of powers

66. Plaintiff repeats and realleges each and every preceding allegation of this complaint as though fully set forth at length herein.

67. All of the foregoing notwithstanding, even if the Court were to construe IEEPA as authorizing tariffs, the IEEPA Tariff Orders must nevertheless be held unlawful because IEEPA, in that event, would constitute an impermissible delegation of legislative power from Congress to the President.

68. The United States Constitution vests in Congress exclusively the power to "lay and collect … Duties." U.S. CONST. art. I, § 8, cl. 1.

69. Under the precedent of the United States Supreme Court, separation-of-powers principles, and binding precedent, Congress cannot delegate its power to the President unless, at the very least, it provides an intelligible principle that directs and meaningfully constrains the President's exercise of that power. *See Jarkesy v. SEC*, 34 F.4th 446, 460 (5th Cir. 2022) ("the legislative cannot transfer the power of making laws to any other hands; for it being but a delegated power from the people, they who have it cannot pass it over to others"); see also A.*L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935). It is in this vein that IEEPA delegates legislative power to the Executive without providing such an intelligible principle.

70. Plaintiff therefore seeks: (1) a declaration that the IEEPA Tariff Orders are unconstitutional as applied to Plaintiff; (2) an injunction prohibiting Defendants from enforcing the IEEPA Tariff Orders against Plaintiff; and (3) an order requiring Defendants to refund all IEEPA duties collected from Plaintiff, with interest as provided by law.

### COUNT III
### Declaratory Judgment Under 28 U.S.C. § 2201

71. Plaintiff incorporates by reference all preceding allegations of this Complaint as if fully set forth herein.

72. The Declaratory Judgment Act provides that federal courts have the

power "to declare the rights and other legal relations of any interested party seeking such a declaration." 28 U.S.C. § 2201(a).

73. Plaintiff's claims present an actual case or controversy within the meaning of Article III of the United States Constitution regarding: (1) the limits of presidential power under IEEPA; (2) the constitutionality of IEEPA; and (3) CBP's legal authority to implement and collect the disputed tariffs.

74. Plaintiff has standing because it has suffered an injury in fact that is concrete and particularized. As the importer of record, Plaintiff was required to remit IEEPA duties on goods imported into the United States pursuant to the Challenged Tariff Orders, resulting in direct, quantifiable economic harm that is fairly traceable to the challenged government action and redressable by a favorable decision.

75. Plaintiff requests that this Court enter a declaratory judgment pursuant to 28 U.S.C. 2201(a) that: (1) the Challenged Tariff Orders are invalid as applied to Plaintiff; and (2) CBP lacks lawful authority to implement or collect duties from Plaintiff pursuant to the Challenged Tariff Orders.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court:

a) declare that the President lacks constitutional and statutory authority under IEEPA to impose tariffs as applied to Plaintiff;

b) declare that the Challenged Tariff Orders are *ultra vires* and void *ab initio* as applied to Plaintiff;

c) declare that CBP lacks authority to implement and collect from Plaintiff any duties set out in the HTSUS that are based on the Challenged Tariff Orders;

    d) enjoin Defendants from imposing and enforcing against Plaintiff any duties set out in the HTSUS that are based on the Challenged Tariff Orders;

    e) order Defendants to refund to Plaintiff all IEEPA duties collected from Plaintiff pursuant to the Challenged Tariff Orders, with interest as provided by law;

    f) award Plaintiff its reasonable costs and attorneys' fees incurred in bringing this action, to the extent authorized by law; and

    g) grant such further relief as this Court deems proper.

Dated:   New York, New York
           February 2, 2026

**BERLANDI NUSSBAUM & REITZAS LLP**

By:   */s/ Joshua T. Reitzas*
      Joshua T. Reitzas
      125 Park Avenue, 25th
      Floor New York, New York
      10017 (212) 804-6329
      *Attorneys for the Plaintiff*